UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

AMY LIMOLI,

           **Plaintiff,**

      **v.**

                               **C.A. No. 1:18-cv-10561-FDS**

DELTA AIRLINES, INC. AND
MYKAL DENT,

           **Defendants.**

## <u>MEMORANDUM OF LAW IN SUPPORT OF<br>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

Defendants, Delta Air Lines, Inc.[1] ("Delta" or the "Company") and Mykal Dent ("Dent"), submit this Memorandum of Law in Support of Their Motion for Summary Judgment with respect to all of Plaintiff Amy Limoli's ("Plaintiff") claims. Specifically as to: Count I against Delta and Dent alleging interference with Plaintiff's Family Medical Leave Act (the "FMLA") rights; Count II against Delta and Dent alleging retaliation in violation of the FMLA; Count III alleging tortious interference with contract by Dent; and Count IV alleging wrongful termination in violation of public policy by Delta.

### <u>Summary of Undisputed Material Facts[2]</u>

Delta is a global airline with operations at over 50 airports nationwide, including Boston-Logan International Airport ("Logan Airport"). Statement of Undisputed Material Facts ("SOF") ¶ 1. Plaintiff began working as a Customer Service Agent ("CSA") on or about March 12, 2001

---

[1] Delta's name in the caption is incorrect and the Company's correct legal name is "Delta Air Lines, Inc."
[2] In accordance with Local Rule 56.1, Defendants filed a separate statement of the material undisputed facts and declarations contemporaneously with the Memorandum and Motion for Summary Judgment.

for Northwest Airlines, a predecessor company to Delta. *Id.* ¶¶ 10-11. Plaintiff became a Delta employee in April 2008 after Delta and Northwest Airlines announced their merger. *Id.* ¶ 11. On or about December 10, 2011, Plaintiff's position changed to Passenger Service Agent ("PSA") within Delta's Airport Customer Service ("ACS") department. Declaration of Manette "Eve" Rogers at ¶ 11. The ACS department includes CSAs and PSAs, collectively referred to as "agents." SOF at ¶ 12. CSA duties include, but are not limited to, checking-in passengers and their luggage, ticketing, and working at terminal gates. *Id.* at ¶ 14 PSAs, also known as "Red Coats," supervise and oversee CSAs, offer support and assume CSA duties as necessary, respond to ticketing issues, monitor passenger queues, and address passenger-related issues and inquiries. *Id.* ¶ 15.

Delta expects employees, including Red Coats and CSAs, to "punch-in" at the start of each shift, and "punch-out" at the end of a shift.[3] *Id.* ¶ 17. Red Coats and CSAs punch-in on a time-keeping computer located in the Delta employee break room behind the Delta ticketing counter in Terminal A at Logan Airport. *Id.* ¶ 18. After punching-in, Red Coats and CSAs must attend a shift-briefing meeting led by the Operations Service Manager(s) ("OSM") on duty for the shift. Declaration of Mykal Dent ("Dent Decl.") at ¶ 4. At this meeting, the OSMs and agents discuss important information including, but not limited to, passenger loads, expected challenges such as weather or flight restrictions, passenger fee waivers, and any questions or issues. *Id.*

Delta expects employees to maintain accurate time-clock records. SOF ¶ 7. Accordingly, after *any employee* clocks-in to work, Delta expects that the employee is in fact at work, ready to begin their shift and perform assigned duties. Dent Decl. at ¶ 8. Delta maintains written guidelines titled *The Way We Fly* stating Delta's expectation that all employees "Keep Accurate & Honest Records" as part of their employment, makes clear that "Theft and Misappropriation Are

---

[3] The terms "punch-in," "clock-in," and their variants are equivalent and used interchangeably throughout this Memorandum and statement of facts.

Prohibited", and sets forth a non-exhaustive list of prohibited conduct, including "Falsifying records, including *time cards*, work records, or business expense reports." SOF ¶¶ 8-9 (emphasis added).

Prior to her employment termination, Plaintiff's regularly assigned shift ran from 12:00 p.m. to 8:30 p.m. *Id.* ¶¶ 42. This shift required her to be "punched-in" and ready for work by 12:00 p.m. to attend the shift-briefing meeting with the OSMs and other agents. Dent Decl. at ¶ 4, 8. On March 30, 2017, Plaintiff admits she was running late for work. SOF ¶ 45. She considered three options as she drove to Logan Airport. *Id.* ¶ 47. Option One: park in the garage first punch-in late for her shift. Option Two: pull-up to the terminal, at the active passenger zone, leave her running car, then punch-in for work just before the start of her noon shift, then return to her car and park it. Option Three: call Delta to say she would be late, clock in after noon, and then return and park her car. *Id.* ¶ 47. Plaintiff elected to park illegally at the curbside, in the passenger-unloading zone at Terminal A, entered the employee break room behind the Delta ticketing counter, and punched-in for work at 11:56 p.m., four minutes before her scheduled shift was set to begin. *Id.* ¶ 48.

While still clocked-in, Plaintiff returned to her vehicle. As she exited the terminal, Plaintiff encountered CSA Kim Dunn who was entering the terminal. *Id.* ¶ 49. She told Ms. Dunn that she "will be back," returned to her idling vehicle, and drove to the central parking garage. *Id.* ¶¶ 48-49. Plaintiff arrived at the central parking garage at 11:58:32 A.M. as evidenced by the parking stub she received upon entering the garage. *Id.* ¶ 50. She parked her vehicle on the first floor of the garage, walked to and then waited for the elevator, exited the elevator on the second floor, then ran across the Sky Bridge to return to the terminal and into the employee locker room area. *Id.* ¶ 51. Plaintiff placed her belongings in the Red Coat office, put on her uniform, geared-up with her

3

radio and battery, and then proceeded to the briefing room to attend the 12:00 p.m. shift-briefing meeting. *Id.* ¶ 52. She arrived at 12:04 p.m., four minutes late. *Id.* ¶ 54. OSM Mykal Dent observed Plaintiff's late arrival to the meeting. Dent Decl. at ¶ 10.

Just before the start of the shift-briefing, Dunn spoke to OSMs Beth Cerqueira and Mykal Dent and reported Plaintiff's conduct. SOF ¶ 53. Based on this conversation and his own observation of Plaintiff arriving late to the briefing, Dent spoke to Plaintiff at approximately 7:30 p.m., close to the end of her shift, in order to understand what happened. *Id.* ¶ 57-58. He asked Plaintiff why she was late to the briefing, to which Plaintiff replied that she was not late but had "punched in on time." *Id.* ¶ 59. Dent then questioned Plaintiff as to why she was late to the meeting if she was not late to work. *Id.* ¶ 60 She admitted that she "parked out front, punched in and went and parked after that." *Id.* Upon hearing this, Dent immediately informed Plaintiff "oh, you can't do that" and began questioning Plaintiff about other dates she arrived late to work by pulling up her attendance records. *Id.* ¶ 61-62. Dent next requested that Plaintiff prepare a statement explaining her conduct of that day. Plaintiff, too distraught at the time, did not write her statement until the next day. *Id.* ¶ 63, 68-69.

Plaintiff wrote her statement at the end of her shift the next day, March 31, 2017. *Id.* ¶ 77. In her statement, Plaintiff admitted that she "punched in at 11:56 [a.m.]" and that she "ran back out to my vehicle." *Id.* ¶ 78; *see also* Declaration of Manette "Eve" Rogers ("Rogers Decl.") at Exh. L (Limoli's Written Statement). Plaintiff "sincerely apologize[d]" and promised that she "will not do this again," referring to "pull[ing] up and punch[ing] in and get[ting] back in the car." SOF ¶ 79; *see also* Rogers Decl. at Exh. L (Limoli's Written Statement).

Delta suspended Plaintiff's employment on March 31, 2017 pending a further investigation into her actions by Human Resources. SOF ¶ 80. Dent e-mailed Human Resources Manager Eve

4

Rogers with his statement of what occurred and asked her if HR had comparators where employees engaged in similar misconduct and asked the appropriate Performance Development or "PD" action for such conduct. *Id.* ¶¶ 71-72. Rogers responded to the email and informed Dent that Delta considered Plaintiff's conduct "time-theft" and that the typical discipline is termination. *Id.* ¶ 74. On April 1, 2017, Dent prepared a Recommendation for Termination ("RFT") for Plaintiff and sent it to his Department Manager, Michael Morrison, and Rogers for approval. *Id.* ¶ 81

On April 7, 2017, Rogers prepared her own RFT recommending employment termination and sent it to Josh Jessup, HR General Manager. *Id.* ¶ 82. Rogers' RFT stated that Plaintiff "parked at the curb," "left her vehicle unattended," "proceeded to clock in to avoid receiving a tardy," and "move[d] her car after she was clocked in." *Id.* Rogers directed that Plaintiff have the opportunity to resign, but that if she refused, Delta should terminate her employment. *Id.* On April 19, 2017, Spagnolo, Plaintiff's regular supervisor, called Plaintiff and informed her that she had the option to resign in lieu of termination. *Id.* ¶ 84. On April 20, 2017, Plaintiff informed Spagnolo that she would not resign and instead opted for termination. *Id.* ¶ 85.

Plaintiff appealed her employment termination to Delta's Equal Opportunity ("EO") office by writing a letter asking Delta to reconsider and rescind her discharge. *Id.* ¶¶ 86-87. In her letter, Plaintiff confirmed that Dent began asking about her attendance record only after she admitted that she "pulled up ran in and punched in then went and parked at central." *Id.* ¶ 87; Cabantog Decl. at Exh. J (DELTA_00000017). Plaintiff admitted that she "used bad judgement [sic] and for that I am sorry." SOF ¶ 87; Cabantog Decl. at Exh. J (DELTA_00000017). She acknowledged that her conduct warranted some form of discipline and that she would accept "a reprimand such as a coaching or a letter in [her] file." SOF ¶ 90. By letter dated June 20, 2017 EO Manager Brian San

Souci informed Plaintiff that he denied her appeal, explaining that she parked "curbside at Boston Logan airport, clocked in and moved [her] vehicle in an attempt not to be tardy."   *Id.* ¶ 91.

**Argument**

I.      **Standard of review**.

Summary judgment is appropriate where the pleadings, depositions, discovery materials, and affidavits show that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When the party moving for summary judgment does not bear the burden of proof at trial, the moving party may satisfy its burden of production by either: (1) affirmatively negating an essential element of the nonmoving party's claim or (2) demonstrating that the nonmoving party's evidence at the summary judgment stage is insufficient to establish the nonmoving party's claim or defense.  *Celotex*, 477 U.S. at 323-326.

A nonmovant must do "more than raise tenuous insinuations on the facts surrounding her termination and the [employer's] reason for taking that action. This is insufficient to create a triable issue on discriminatory or retaliatory animus."  *Henry v. United Bank*, 686 F.3d 50, 55 (1st Cir. 2012) (citing *Roman v. Potter*, 604 F.3d 34, 40 (1st Cir. 2010)).  The party opposing summary judgment may not simply "rest upon mere allegation or denials of [her] pleading," but instead must "present affirmative evidence."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Plaintiff's claims fail as they rely solely on conjecture and speculation, or have no basis in law and therefore warrant dismissal.

II.     **Defendants did not interfere with Plaintiff's rights under the FMLA.**

To establish a claim of FMLA interference, Plaintiff must establish: (1) she was eligible for FMLA protection; (2) that Delta was an employer covered by the FMLA; (3) she was entitled

6

to take leave; (4) she gave notice of intent to take leave; and (5) Defendants denied her legally entitled leave. *Surprise v. Innovation Grp.*, Inc., 925 F. Supp. 2d 134, 145 (D. Mass. 2013). Plaintiff cannot meet her *prima facie* case of FMLA interference for three reasons. First, Dent is an individual and not an employer under the FMLA. Second, because the essence of her claim is retaliation, and not interference with any right under the FMLA. And third, neither Delta nor Dent ever denied Plaintiff any leave rights to which she was entitled.

### A. *Dent was not involved in any of Plaintiff's leave requests or Delta's decisions.*

The FMLA defines an "employer" to include "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer. 29 U.S.C. § 2611(4)(A)(ii)(I); 29 C.F.R. § 825.104(d). Though the First Circuit has not addressed whether a supervisor may be individually liable under the FMLA, courts in this Circuit have applied a five-factored test to determine whether the alleged individual fits under the definition of employer. *See, e.g.*, *Boadi v. Ctr. for Human Dev., Inc.*, 239 F. Supp. 3d 333, 348 (D. Mass. 2017). The test involves examining whether the individual: (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; (4) maintained employment records; and, (5) had personal responsibility for making decisions that contributed to the alleged violation. *Brunelle v. Cytec Plastics, Inc.*, 225 F.Supp.2d 67, 82 (D. Me. 2002) (finding no individual liability under the FMLA for "a front-line supervisor—at the bottom of four rungs of management").

Applying these factors, Dent is not an "employer" under the FMLA and cannot be individually liable for FMLA interference (Count I) or retaliation (Count II). Dent was not personally responsible for making FMLA decisions, nor was Dent involved in determining Delta's response to Plaintiff's (or any other employee's) requests. *See* Dent Decl. at ¶ 7. Rather,

7

Sedgwick, Delta's vendor handles all FMLA leave requests, approvals, and denials. *Id.* Though Dent interviewed potential candidates and applicants for positions, he was not the final decision-maker on hiring decisions. *Id.* ¶ 6. The ultimate decision to hire (or not hire) is with each station manager and, in this case, the station manager was Michael Berry. *Id.* Similarly, Dent did not have the authority to terminate an employee's employment and only had the ability to recommend termination, as he did with Plaintiff. *Id.* Indeed, Delta's former Station Manager at Logan Airport, Alexandra Nordquist, overruled at least one of Dent's termination recommendations. *Id.* Moreover, he did not control employee work schedules. *Id.* ¶ 7. Delta maintains a seniority bidding system whereby Red Coats bid for shift assignments and workdays six months in advance. *Id.* Nor did he have authority to determine the rate and method of any employee's pay. *Id.* He did not maintain employee personnel records and if an employee required documents added to a personnel file, he would pass such information along to human resources. *Id.*

Dent does not meet any of the indicia required to establish his individual liability for FMLA interference and, thus, Plaintiff's claim against him should be dismissed.

> B.      *Plaintiff does not have an FMLA interference claim against either Defendant and at most alleges a claim of FMLA retaliation.*

Plaintiff cannot establish a standalone FMLA interference claim against either Defendant because she received all FMLA benefits to which she was entitled. Her interference claim under § 2615(a) is merely masquerading as a claim of FMLA retaliation. *See Chacon v. Brigham & Women's Hosp.*, 99 F. Supp. 3d 207, 213 (D. Mass. 2015) (Saylor, J.). In *Chacon*, the plaintiff's employment terminated about one week after requesting FMLA. This same Court found that Chacon's FMLA interference and retaliation claims under the FMLA were "redundant at best" and accordingly dismissed the interference claim. *Id.* at 214. Similarly, in *Trust v. Harvard University*, the court granted summary judgment on *both* the FMLA interference *and* retaliation claims noting

that, "[c]ourts generally analyze FMLA retaliation and interference cases together when they arise out of the same set of facts." No. CV 17-10183-RGS, 2018 WL 3543531, at *8, n.8 (D. Mass. July 23, 2018). Because Plaintiff alleges only that Delta and Dent took adverse action against her due to her FMLA leave, her claim is not for interference, but rather for retaliation.

C.      *Defendants did not deny Plaintiff any of her rights under the FMLA.*

Even assuming Plaintiff can allege an FMLA interference claim against Dent and Delta separate and apart from her retaliation claim, she cannot meet her FMLA *prima facie* case because neither Delta nor Dent denied her FMLA benefits to which she was entitled. *See Surprise*, 925 F. Supp. 2d at 145. *See Chidebe v. MCI Telecommunications Corp.*, 19 F.Supp.2d 444, 448 (D. Md. 1998) (finding no violation of the FMLA where plaintiff "received all the FMLA benefits she was entitled to"); *Dodgens v. Kent Mfg. Co.,* 955 F.Supp. 560, 564–65 (D.S.C.1997) (granting summary judgment for defendant despite failure to explain FMLA benefits and leave rights to plaintiff, where plaintiff nevertheless received all the leave benefits to which he was entitled).

Here, Plaintiff conceded at deposition that the only time Delta denied her request for FMLA-leave was when she had exhausted the 12-week entitlement and did not have any FMLA leave available. *See* Cabantog Decl. at Exh. B (Limoli Dep. 23:1-15). Indeed, in response to Defendants' interrogatory asking her to identify each and every request for FMLA leave and whether such request "was granted or denied." In response she did not, and could not, identify a single instance. *See* Cabantog Decl. at Exh. C (Plaintiff's Responses to Defendants' Interrogatories, No. 3 at pp. 10-12). Delta's records confirm that during the last six years of her employment, Delta approved over *1,400* hours of FMLA leave requested by Plaintiff. *Id.*; *see also* SOF ¶ 23-29.

9

Plaintiff can make no credible argument that either Delta or Dent ever denied her FMLA leave. In the case of Dent, Plaintiff cannot show that he was an "employer" or that Dent had the authority to review or adjudicate her leave requests. Accordingly, the Court should dismiss Plaintiff's FMLA interference claim against both Defendants.

**III.    There is no evidence Defendants retaliated against Plaintiff for exercising her rights under the FMLA. The evidence establishes Delta terminated her employment for a legitimate non-discriminatory business reason after it discovered that she misreported her time to avoid being marked tardy.**

This Circuit applies the *McDonnell Douglas* burden-shifting framework to FMLA retaliation cases. *See Colburn v. Parker Hannifin/Nichols Portland Div.*, 429 F.3d 325, 335 (1st Cir. 2005) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 161 (1st Cir. 1998) (same). Under that framework, the plaintiff carries the initial burden to establish a *prima facie* case that: (1) she availed herself of a protected right under the FMLA; (2) she was adversely affected by an employment decision; and (3) there is a causal connection between her protected activity and the employer's adverse action.[4] *Hodgens*, 144 F.3d at 161. If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employee's [termination]." *Id.* at 160. Once the defendant articulates a legitimate nondiscriminatory reason for the adverse action, "the presumption of unlawful discrimination disappears" and the burden shifts back to the plaintiff to prove "by a preponderance of the evidence" that the defendant's proffered reasons are pretextual. *Weston-Smith v. Cooley Dickinson Hosp., Inc.*, 153 F.Supp.2d 62, 70 (D. Mass. 2001).

To prevail at summary judgment, a defendant may show that the plaintiff is unable to establish a *prima facie* case of discrimination; or, if the plaintiff successfully established a *prima*

---

[4] The Parties do not dispute that Plaintiff requested, and Delta approved, her FMLA leave. It also is undisputed that her termination was an adverse employment action. However, there is no causal connection between Plaintiff's leave requests and her employment termination because of her admitted misconduct.

10

*facie* case, the defendant may win summary judgment by showing that the plaintiff could not produce sufficient evidence of pretext to rebut an assertion of nondiscriminatory reasons for the discharge. *See Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 172 (1st Cir. 1998) (affirming summary judgment based on insufficient evidence to warrant a finding of pretext on plaintiff's FMLA retaliation claim). Plaintiff cannot show either,  a connection between her employment termination and request, or use of, FMLA leave or that her discharge for intentionally misrepresenting her time was a pretext for FMLA retaliation.[5]

> A.      *There is no causal connection between Plaintiff's employment termination and her FMLA leave.*

Plaintiff has not met her *prima facie* burden because she cannot show a causal connection between her FMLA leave and the termination of her employment for two reasons.  First, her only evidence of causation is the temporal proximity between her FMLA leave and her termination. Such evidence is insufficient to establish her *prima facie* case.  Second, Plaintiff admitted that her conduct on March 30 warranted disciplinary action, thus preventing her from arguing that her termination was in any way connected to her requesting or taking FMLA leave.

The only "evidence" of causation on which Plaintiff relies is chronological proximity; she took FMLA leave on March 26 and 27, three days before she violated Delta's time keeping policies and before Delta and Dent learned of her misconduct.   The First Circuit has observed "[c]hronological proximity does not by itself establish causality, particularly if [t]he larger picture under cuts any claim of causation." *Ramirez Rodriguez v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 425 F.3d 67, 85-86 (1st Cir. 2005).  Here, the "larger picture" reveals that Delta provided

---

[5] Again, Dent may not be held individually liable for either FMLA interference or retaliation because he is not an "employer" under the FMLA.  But assuming the Court finds that he is an employer under the FMLA, Plaintiff's claims against Dent still fail as explained below.

Plaintiff in excess of 1,400 hours of approved FMLA leave over a span of six years.  Indeed, her termination arose *only after* she admitted to falsifying her time.

Moreover, Plaintiff's admissions cut off any possible causal nexus between her FMLA leave and her termination.  Not only did she admit to her misconduct but she also conceded that adverse employment action was justified by her misconduct.  During her deposition, Plaintiff acknowledged that, while she disagreed with the level of discipline, she should have received *some* form of corrective action – "a verbal, a coaching . . . a demotion," a transfer to "another department," or "anything."  *See* Cabantog Decl. Exh. B (Limoli Dep. 84:13-16).  She further concedes that Delta and Dent could have "instead downgrade[d] me . . . move[d] me to another department . . . Why not put me on a letter, why not do this, why not do that[?]"  *Id.* (Limoli Dep. 67:21-68:4).  By acknowledging that her conduct warranted discipline, she cannot claim now that the adverse action was causally connected to her FMLA leave.

Plaintiff also admitted that if she learned of another employee engaging *in the exact same conduct*, she would have reported that employee to management.  As a PSA/Red Coat, Plaintiff supervised CSAs.  SOF ¶ 15.  She admitted at deposition that she would have reported other employees for clocking-in before parking, if she had seen the misconduct.[6]  *See* Cabantog Decl. at Exh. B (Limoli Dep. 103:18-104:12).  Although she tried to claim others employees engaged in similar conduct and did not receive discipline, she could not provide evidence of a single instance.  Plaintiff explained that employees "wouldn't do it in front of me because I would . . . have to bring it to the supervisor, my manager."  *Id.*  Plaintiff further concedes that she would have been required to report to management "if I saw" employees punching-in for work before parking their car.  By

---

[6] Plaintiff attempted to claim disparate treatment of similarly situated employees. *See infra* Part III.C.  She cannot do so. Delta has terminated numerous employees for time-clock violations after their first offense and Delta treated her no differently.  Thus, Plaintiff's disagreement with the *level* of discipline is of no moment.

her own admission, she would have reported herself up the chain of command; which is exactly what CSA Dunn reported to Dent when she saw Plaintiff, and as Dent did when he reported the issue to Eve Rogers and Michael Morrison. *Id.* (Limoli Dep. at 103:18-104:12).

Plaintiff cannot establish the causality prong of her *prima facie* claims. Thus, Plaintiff's claims of retaliation must be dismissed.

> B. *Delta had a legitimate, nondiscriminatory reason for investigating and terminating her employment for fraudulently recording her time.*

Assuming Plaintiff can establish a *prima facie* retaliation claim against either Delta or Dent – which she cannot do – Delta had a legitimate, nondiscriminatory business reason for investigating her admitted conduct and then terminating her employment for misreporting her time. An employer may lawfully discharge an employee for fraud and dishonesty. "[N]othing in the FMLA prohibits an employer from investigating allegations of dishonesty or from terminating an employee who violates company policies governing dishonesty." *Rush v. E.I.duPont De Nemours & Co.*, 911 F. Supp. 2d 545, 562 (S.D. Ohio 2012). Delta's policies make clear that "theft and misappropriation are prohibited" and specifically prohibit "[f]alsifying records, *including time cards*, work records, or business expense reports." SOF at ¶ 8-9 (emphasis added). Delta's employee guidelines also requires all employees to "Keep Accurate & Honest Records" as part of their employment and explains that every employee must ensure that any reporting of information "is accurate, honest, and timely." *Id.* ¶ 9.

> C. *Plaintiff's termination for misreporting her time was not pretextual.*

Upon a showing of a legitimate, nondiscriminatory reason for an adverse action, the burden shifts to the plaintiff to establish that the reason is actually a pretext for the termination. *See Hodgens*, 144 F.3d at 160 (holding that once the defendant has articulated a legitimate business reason for the adverse employment decision, the plaintiff bears the ultimate burden of proving

pretext).  To show pretext, a plaintiff  must "show more than that the defendants' asserted reason for taking adverse action against [her] was not the real reason . . . [she] must show that the reason given was a cover for retaliation."  *Soto-Feliciano v. Villa Cofresi Hotels, Inc.*, 779 F.3d 19, 32 (1st Cir. 2015).  Here, even if Plaintiff could establish her *prima facie* case, there is no evidence that Delta's legitimate, non-retaliatory reason for investigating and terminating her employment was a pretext for FMLA retaliation.  A court may not sit as a super-personnel department that reexamines an entity's business decisions.  *Gonzalez v. El Dia, Inc.*, 304 F.3d 63, 69 (1st Cir. 2002) (quoting *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir. 1988)).

Plaintiff cannot demonstrate that Delta or Dent treated her less favorably than they treated similarly situated employees who had engaged in time-falsification.  Delta's records establish that between 2014 and 2017, the Company terminated thirty-four employees nationwide for misreporting time, including eight employees stationed in Boston.  *See* Rogers Decl. at ¶ 9.  Of these thirty-four employees, Delta terminated seven employees – including two Boston agents – for clocking-in before parking.  *Id.* at ¶ 10.

Though Plaintiff attempted to offer evidence of pretext by alleging that Delta condoned other employees who punched-in to avoid being marked tardy, her claims are not only belied by the Company's termination records, but her assertions are based on pure speculation.  Plaintiff conceded that she is only "guessing"[7] about other employees leaving work after clocking-in to

---

[7] Plaintiff admitted at deposition that she was only "guessing" about other employees engaging in similar misconduct:

> **Q: Well, are you guessing that these people were doing this? Are you guessing?**
> A: Sure.
> **Q: That's a "yes" or "no."**
> A: Sure, sure.
> **Q: So yes, you're guessing?**
> A: Yes.

Cabantog Decl. at Exh. B (Limoli Dep. 105:4-12).

park their cars and that she "would just hear it[,] . . . never saw it[,] [and] would just hear the gossip at night when I worked at night." Cabantog Decl. at Exh. B (Limoli Dep. 104:13-105:12). And she offered no evidence that any Delta manager was aware of the gossip. Indeed, Delta's termination records confirm that as soon as Delta or a manager learns of time-keeping violations, the employee's conduct is immediately investigated and, if established, the employee's employment terminated. In Dent's case, he checked with HR Manager Rogers, who confirmed that termination is the appropriate discipline for such misconduct. Unsupported and speculative evidence is not sufficient to survive summary judgment. *See Hodgens*, 144 F.3d at 168 (noting that summary judgment is appropriate where the non-moving party alleging pretext "rests merely upon conclusory allegations, improbable inferences, and unsupported speculation").

Moreover, there is no dispute that Plaintiff was dishonest with her timekeeping and deliberately attempted to avoid being marked as tardy. At her deposition, she admitted that on March 30 she was "so worried about being late. They have it drilled in your head: Don't be late. . . . [s]o you'd do anything to get there. You do stupid things . . . I did [a stupid thing]." Cabantog Decl. at Exh. B (Limoli Dep. 29:6-12). Plaintiff's admission is consistent with Dent's and Rogers' recommendations for termination, both of whom concluded that she punched in to avoid receiving a tardy. *See* Rogers Decl. at ¶13, Exh. I (Rogers RFT at DELTA_00001841); Dent Decl. at ¶11, Exh. A (Dent RFT at DELTA_00001842-43).

Plaintiff can point to no credible evidence – because there is none – enabling a reasonable jury to find that Delta or Dent retaliated against Plaintiff for asserting rights under the FMLA. Accordingly, the Court should dismiss Count II of the Complaint.

**IV.     Plaintiff's claim of tortious interference of contract fails because Dent was not acting beyond the scope of his supervisor role or with actual malice when he investigated Plaintiff's time-keeping violation.**

To prevail on a tortious interference claim against a supervisor in the employment and discharge context, a plaintiff must demonstrate evidence that the management official acted with actual malice. *See Gram v. Liberty Mut. Ins. Co.*, 384 Mass. 659, 663-64 (1981). Actual malice requires a showing that a supervisor was acting beyond "the scope of his supervisory duties." *See Prescott v. Higgins*, 538 F.3d 32, 43 (1st Cir. 2008).

Actual malice is a high bar that Plaintiff cannot overcome. Absent some evidence that a supervisor acted in a "spiteful, malignant purpose, unrelated to the legitimate corporate interest," a claim of tortious interference of contract cannot survive summary judgment. *King v. Driscoll*, 418 Mass. 576, 587 (1994). Indeed, evidence of "motivation of personal gain, including financial gain . . . generally is not enough to satisfy the improper interference requirement." *Id.* "Similarly, personal dislike will not warrant an inference of the requisite ill will." *Id.* Moreover, Plaintiff must establish that "malice was the controlling factor in [Dent]'s interference." *Id.*

Plaintiff's claim fails because Dent acted solely within his role as a manager to advance Delta's legitimate corporate interest. Delta's corporate interest is the accurate reporting of employee timekeeping as explained in *The Way We Fly*. SOF ¶¶ 7-9. Ms. Limoli's "evidence" of Dent's alleged malice was his reporting up the chain of command, specifically to HR manager Eve Rogers. *See* Cabantog Decl. at Exh. B (Limoli Dep. at 92:11-17). She argues that Dent "could have gone to Michael Morrison and Michael Berry [but] he didn't." *Id.* Yet she admits that, as a supervisor, if she had witnessed the exact same scenario (e.g. an employee parking a car while on-the-clock), she would have reported the time-theft to management as Dent did. *Id.* (Limoli Dep. at 103:18-104:12). Plaintiff's tortious interference claim cannot survive summary judgment when

she concedes that: (1) what she did was wrong; (2) Dent's report of misconduct to his managers was permissible; and (3) she would have reported other employees for similar misconduct. *See* Cabantog Decl. at Exh. B (Limoli Dep. 83:19-20; 103:18-104:12).

Even if the Court finds that Dent acted beyond the scope of his employment, his conduct did not rise to the level of actual malice necessary for three reasons. First, the record evidence demonstrated that Dent *had no intention* of firing Plaintiff until HR informed him that Delta considered such time-keeping violations to be a terminable offense. *See* SOF ¶¶ 73-74. That Dent thought that she deserved more lenient discipline than termination undercuts any claim of malice.

Second, Dent had no other motive than to ensure employees follow Delta policies. Plaintiff's only "evidence" of Dent's malice was that he "wants to get a name out there for himself. He wanted to get back to Atlanta. He was trying to get out of Boston . . . He didn't live here; he lived in Atlanta. He was only in Boston for a few months. He didn't know any of us. He didn't know anything going on in my life. He knew nothing." *See* Cabantog Decl. at Exh. B (Limoli Dep. Tr. 93:5-13). Plaintiff could muster nothing more than "it seems like he was out to get people, just to make a name for himself to get him back to Atlanta where he needed to be to get home." *Id.* (Limoli Dep. Tr. 152:16-18). Even if Dent was motivated by some personal or financial gain, or dislike towards Plaintiff – which he was not – such evidence is not enough to sustain a tortious interference claim. *King*, 418 Mass. at 587. These allegations, even if true, do not rise to the level of actual malice.

Third, Plaintiff has not shown that Dent's alleged malice was the "controlling factor" in his conduct. Rather the record evidence proves that Dent investigated Plaintiff's conduct after Dunn observed Plaintiff leaving the terminal, after Dent saw her arrive late to the meeting, after

Plaintiff admitted to her misconduct, and after HR informed him that discharge of employment was the appropriate discipline.

**V.      Plaintiff's claim of wrongful termination in violation of public policy fails as a matter of law because she cannot identify a well-defined public policy that her termination violated.**

To establish a claim of wrongful termination in violation of public policy under Massachusetts law, Plaintiff must prove that Delta terminated her employment because she: (a) asserted a right guaranteed by law; (b) did what the law requires; (c) refused to do what the law forbids; or, (d) complied with a clear statutory expression of legislative policy. *Flesner v. Technical Comm. Corp.*, 410 Mass. 805, 810-11 (1991); *Wright v. Shriners Hosp. for Crippled Children*, 412 Mass. 469, 472-73 (1992). Plaintiff's claim fails, however, for two independent reasons: (1) she cannot assert a claim of wrongful termination in violation of public policy when a separate federal or state statute provides a remedy; and, (2) she has not identified a guaranteed right apart from her FMLA claims for which she was terminated.

Plaintiff's claim is barred as a matter of law because her wrongful termination claim invokes the same public policy established by a federal statute, the FMLA. *See Dineen v. Dorchester House Multi-Service Ctr., Inc.*, 2014 WL 458188, at *4 (D. Mass. Feb. 3, 2014). Massachusetts courts allow a common law cause of action to proceed only where "there is no other way to vindicate such public policy." *Melley v. Gillette Corp.*, 19 Mass. App. Ct. 511, 513 (1985). This tenet applies whether the remedy is vindicated by a state or federal statute. *Valerio v. Putnam Assoc. Inc.*, 173 F.3d 35, 46 (1st Cir. 1999) (applying *Melley* and concluding that the federal remedy in the Fair Labor Standards Act precluded a claim for wrongful termination in violation of public policy); *Perez v. Greater New Bedford Voc. Tech. Sch. Dist.*, 988 F. Supp. 2d 105, 113 (D. Mass. 2013) (finding that wrongful termination in violation of public policy is inapplicable where

18

"there is a comprehensive remedial statute, [and] the creation of a new common law action based on the public policy expressed in that statute would interfere with that remedial scheme.").

Two courts in the First Circuit have held that the FMLA's remedial provisions precludes an employee's wrongful termination claim. *See Kelly v. Lawrence Pub. Sch.*, No. 16-cv-11116-DJC, 2018 WL 6833508, at *3 (D. Mass. Dec. 27, 2018), *appeal docketed*, No. 19-1110 (1st Cir. Jan. 25, 2019); *Minahan v. Town of E. Longmeadow*, No. 12-cv-30203-MAP, 2015 WL 668451, at *1 (D. Mass. Feb. 17, 2015). Because Plaintiff's wrongful termination claim arises from "the very acts giving rise to her federal claim" her claim cannot stand. *Dineen*, 2014 WL 458188, at *4 (False Claims Act precluded wrongful termination claim).

Plaintiff's wrongful termination claim fails for another reason: she cannot identify another well-defined public policy, other than the FMLA, that Delta allegedly violated when it terminated her employment. *See Surprise*, 925 F.Supp.2d at 147-48 (citing *Wright*, 412 Mass. at 472-73). Claims for wrongful termination occupy a narrow exception to the general at-will employment rule that allows redress only "for employees who are terminated for asserting a legally guaranteed right (*e.g*., filing workers' compensation claim), for doing what the law requires (*e.g*., serving on a jury), or for refusing to do that which the law forbids (*e.g.,* committing perjury)." *Smith-Pfeffer v. Superintendent of Walter E. Fernald State Sch.*, 404 Mass. 145, 149-50 (1989). Here, Plaintiff simply has no record evidence that she asserted a right guaranteed by law, that she did something the law requires, refused to do what the law forbids, or complied with a clear statutory expression of legislative policy. Indeed, Plaintiff's Complaint does not identify any statutory or protected right. *See* ECF Doc. No. 1 (Complaint and Jury Demand at ¶ 67). Accordingly, her claims should be dismissed.

**Conclusion**

Plaintiff admissions critically undermine each of her claims.  After being caught misrepresenting her time and admitting her wrongdoing, Plaintiff apologized for her misconduct and promised never to do it again.  She even conceded that she should receive some form performance discipline. Thus, she cannot meet any of her burdens as the moving party.  Moreover, she points to no credible evidence and relies on pure speculation to support her claims. Accordingly, for the reasons above, this Court should dismiss her claims and enter summary judgment for Defendants on all counts.

Respectfully submitted,

**DELTA AIR LINES, INC. AND
MYKAL DENT**

By their attorneys,

/s/ Lisa Stephanian Burton
Lisa Stephanian Burton,  BBO# 562096
Lorenzo R. Cabantog,  BBO# 692298
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
One Boston Place, Floor 35, Suite 3500
Boston, MA 02108
Telephone:  617.994.5700
Facsimile:  617.994.5701

Dated:  June 20, 2019

# CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2019 this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those indicated as non-registered participants.

/s/ Lorenzo R. Cabantog _____
Lorenzo R. Cabantog

38986038.2