UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **AMY LIMOLI,** | |
| **Plaintiff,** | |
| **v.** | **C.A. No. 1:18-cv-10561-FDS** |
| **DELTA AIRLINES, INC. AND MYKAL DENT,** | |
| **Defendants.** | |

## STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1, Defendants Delta Air Lines, Inc. ("Delta" or the "Company") and Mykal Dent ("Dent") submit the following Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment. Unless otherwise noted, all of the exhibits referenced herein are annexed to the Declaration of Lorenzo Cabantog ("Cabantog Decl."), dated June 20, 2019, the Declaration of Mykal Dent ("Dent Decl.") dated June 20, 2019, or the Declaration of Manette "Eve" Rogers, dated June 20, 2019.

## I.    Background of Delta Air Lines, Inc.

1.    Delta is one of the world's largest airlines, serving more than 180 million customers each year, at more than 50 airports nationwide, including Boston-Logan International Airport ("Logan Airport"). Rogers Decl. at ¶ 3.

2.    Headquartered in Atlanta, Delta employs more than 85,000 employees worldwide and operates a mainline fleet of more than 900 aircraft. Rogers Decl. at ¶ 3.

1

3.      Delta maintains a Family and Medical Leave policy within its Healthcare Benefits Handbook and which also is posted on its intranet, both of which are accessible to all Delta employees. Rogers Decl. at 7, Exh. A (DELTA_00000415, 2049).

4.      Delta prohibits all forms of unlawful discrimination, including discrimination based on race, color, religion, national origin, creed, sex (including pregnancy), disability, genetic information, marital status, sexual orientation, gender identity, citizen status, parental status, veteran status, or any other characteristic that may be protected by law.  Rogers Decl. at Exh. B, (DELTA_00002070).

5.      Delta does not tolerate harassment in the workplace based on any protected characteristic, or any form of bullying or intimidation.   Rogers Decl. at Exh. B (DELTA_00002070).

6.      Delta's non-discrimination and non-harassment policies are included in its employee manual, *The Way We Fly*, and posted on its intranet.  Rogers Decl. at Exh. B, (DELTA_00002070).

7.      Delta expects its employees to maintain accurate time-clock records and, to that end, Delta maintains company guidelines compiled into a handbook titled *The Way We Fly*.  Rogers Decl. at ¶ 8, Exh. B (DELTA_00002059-2090).  These guidelines reinforce Delta's fundamental values and other basic behaviors required of all employees.  Rogers Decl. at Exh. B (DELTA_00002061).

8.      *The Way We Fly* makes clear that "Theft and Misappropriation Are Prohibited" and enumerates a non-exhaustive list of prohibited conduct which also prohibits "Falsifying records, including *time cards*, work records, or business expense reports." Rogers Decl. at ¶ 8, Exh. B (DELTA_00002061) (emphasis added).

2

9.      Delta's *The Way We Fly* also requires its employees to "Keep Accurate & Honest Records" as part of their employment.  Rogers Decl. at ¶ 7, Exh. B (DELTA_00002082).  The policy directs that every employee must ensure that any reporting of information "is accurate, honest, and timely."  Rogers Decl. at ¶ 8, Exh. B (DELTA_00002082).

## II.      Plaintiff's employment history at Delta Air Lines

10.      Northwest Airlines hired Plaintiff Amy Limoli ("Plaintiff") as a Customer Service Agent ("CSA") for Boston-Logan International Airport ("Logan Airport") on or about March 12, 2001.  Cabantog Decl. at Exh. A (DELTA_00001898).

11.      Delta and Northwest Airlines merged in April 2008 and Plaintiff became a Delta employee. Rogers Decl. at ¶¶ 3, 11.

12.      Within Delta's Airport Customer Service ("ACS") department, the Company employs CSAs and Passenger Service Agents ("PSAs" or "Red Coats"). Declaration of Mykal Dent ("Dent Decl.") at ¶ 3

13.      CSAs and Red Coats directly report to an Operations Service Manager ("OSM") who is responsible for overseeing Delta's above-the-wing and customer service operations.  Dent Decl. at ¶ 4.

14.      CSAs are primarily responsible for checking-in passengers and their luggage, handling ticketing, and answering customer service-related inquiries from passengers.  Dent Decl. at ¶ 3.

15.      The Red Coats assume the same customer service duties as CSAs but also supervise the CSAs, resolve conflicts, and address customer service related issues. Dent Decl. at ¶ 3.

16.      Red Coats and CSAs are expected to timely report to work for their designated shift-start times.  Cabantog Decl. at Exh. B (Limoli Dep. 26:1-6).

17.     As part of that expectation, Delta requires Red Coats and CSAs to "punch-in" at the beginning of a shift and "punch-out" at the end of a shift. Cabantog Decl. at Exh. B (Limoli Dep. 26:1-6); Dent Decl. at ¶ 8.

18.     At Logan Airport, Delta's time-keeping computer for Red Coats and CSAs is located in the employee break room within Terminal A behind the Delta ticketing counter.  Dent Decl. at ¶ 8.

19.     To clock-in, an employee physically takes his or her badge and swipes the card into a reader while selecting either  "clock-in" or "clock-out" to indicate the start or end of their shift, respectively.  Dent Decl. at ¶ 8.

### III.     Plaintiff's FMLA History at Delta Air Lines

20.     Between 2011 until 2017, Plaintiff requested, and Delta provided, intermittent FMLA leave for her chronic sinusitis and to care for her stepdaughter's kidney-related issues. Cabantog Decl. at Exh. B (Limoli Dep. 21:19-22:3); ECF No. 1 Complaint at ¶ 15-17.

21.     Within that six-year span, Delta consistently approved Plaintiff's requests for FMLA leave on behalf of herself or her daughter.  Cabantog Decl. at Exh. C (Plaintiff's Responses to Defendants' First Set of Interrogatories, No. 3).

22.      Plaintiff admits that the only time Delta denied a leave request under the FMLA was because she had exhausted her 12-week FMLA entitlement for the year and it was not available.  Cabantog Decl. at Exh. B (Limoli Dep. 23:7-16).

23.     In 2012, Delta approved 352 hours of FMLA leave requested by Plaintiff.  Cabantog Decl. at Exh. D (DELTA_00001818-1839).

24.     In 2013, Delta approved 422 hours of FMLA leave requested by Plaintiff.  Cabantog Decl. at D (DELTA_00001835).

25.     In 2014, Delta approved 288 hours of FMLA leave requested by Plaintiff.  Cabantog Decl. at D (DELTA_00001831).

26.     In 2015, Delta approved 208 hours of FMLA leave requested by Plaintiff.  Cabantog Decl. D at (DELTA_00001827).

27.     In 2016, Delta approved 88 hours of FMLA leave requested by Plaintiff.  Cabantog Decl. at D (DELTA_00001824).

28.     In 2017, Delta approved 72 hours of FMLA leave requested by Plaintiff.  Cabantog Decl. at D (DELTA_00001820).

29.     Between 2012 and 2017, Delta approved more than 1,400 hours of FMLA leave for Plaintiff.  Cabantog Decl. D at (DELTA_00001818-1839).

## IV.     Plaintiff's disciplinary history at Delta

30.     On July 7, 2013, Ms. Limoli neglected to secure and lock the storage room area behind her assigned ticket counter.  Cabantog Decl. at Exh. E (LIMOLI000008).

31.     A Transportation Security Agency ("TSA") inspector identified this lapse, subjecting Delta to a potential fine of up to $27,000.  Cabantog Decl. at Exh. E (LIMOLI000008).

32.     On July 28, 2013, Plaintiff received a written coaching for this failure ("July 2013 Write-Up").  Cabantog Decl. at Exh. E (LIMOLI000008).

33.     Delta informed Plaintiff that, pursuant to Company policy, any written discipline remains active in an employee's personnel record for 18 months, unless the employee receives additional written discipline within that 18-month period.  Cabantog Decl. at Exh. E (LIMOLI000008). If the employee receives additional written discipline within that period, the discipline will remain active until all written discipline expire.  Cabantog Decl. at Exh. E (LIMOLI000008).

34.     Per Company policy, the July 2013 Write-Up would remain active on her record until January 28, 2015, unless Plaintiff received additional written discipline.  Cabantog Decl. at Exh. E (LIMOLI000008).

35.     On August 16, 2014, Plaintiff received a written coaching for calling out after "swapping" shifts with other employees on the following dates: June 20, July 11, and July 25, 2014 (the "August 2014 Write-up").  Cabantog Decl. at Exh. F (LIMOLI0000013).

36.     After receiving the August 2014 Write-Up, Plaintiff attempted to retroactively request FMLA leave for June 20, July 11, and July 25.  Cabantog Decl. at Exh. B (Limoli Dep. 66:13-67:1).

37.     Delta allowed Plaintiff to make this adjustment and revised its attendance records and removed the August 2014 Write-up from her file.  Cabantog Decl. at Exh. D, (DELTA_00001818-1839); Exh. G (DELTA_00002028).

38.     On March 5, 2016, Plaintiff received additional written discipline for allowing a passenger without the appropriate Visa to board a plane bound for the United Kingdom, which resulted in a fine to Delta for £2,000.00 (GBP) and additional detention costs.  Cabantog Decl. at Exh. H (LIMOLI000010, DELTA_00003141-3143).

39.     At the time, Plaintiff received the March 5, 2016 written coaching no other written discipline was active in her record.  Cabantog Decl. at Exh. H.

40.     Per Delta policy, the March 5, 2016 written coaching would remain on Plaintiff's record for 18 months, expiring on September 5, 2017, unless she received additional discipline within that 18-month period.  Cabantog Decl. at Exh. H (LIMOLI000010).

**V.     Plaintiff falsifies her time records on March 30, 2017**

41.     As noted, Red Coats and CSAs must punch-in before the start of each shift at a time-keeping computer physically located in the employee break room within Terminal A behind the Delta ticketing counter.  Dent Decl. at ¶ 8.

42.     At the time of her employment termination, Plaintiff's regularly assigned shift ran from 12:00 p.m. to 8:30 p.m., meaning that she had to be "punched-in" no later than 12:00 p.m. Cabantog Decl. at Exh. B (Limoli Dep. 26:1-3).

43.     Any punch-in after 12:00 p.m. would result in her being marked "tardy."  Cabantog Decl. at Exh. B (Limoli Dep. 25:21-24).

44.     On March 30, 2017, her shift began at 12:00 p.m.  Cabantog Decl. at Exh. B, (Limoli Dep. 26:1-3); Rogers Decl. at Exh. L (Limoli Statement DELTA_0000089).

45.     That day, Plaintiff elected drive to work because she was running late and could not catch the Logan Express bus from Woburn, Massachusetts.  Cabantog Decl. at Exh. B (Limoli Dep. 29:22-24).

46.     Plaintiff arrived at the departures zone at Boston-Logan International Airport at approximately 11:56 a.m.  Cabantog Decl. at Exh. B (Limoli Dep. 58:13-17); Rogers Decl. at Exh. L (Limoli Statement DELTA_0000089); Dent Decl. at Exh. A (Dent Statement DELTA_0000092-93).

47.     Admittedly running late, Plaintiff testified that she considered three options as she approached the airport: (1) be marked tardy; (2) avoid being tardy by jumping out of her car, punching in for work, and then parking; or (3) calling in first, and clocking in for work, and then parking.  Cabantog Decl. at Exh. B (Limoli Dep. 30:2-7).

48.     Rather than be marked tardy or inform Delta that she was running late, Plaintiff chose to pull her car up to the terminal curbside loading zone, leave her car and proceed to the

employee area to punch-in at 11:56 p.m., four minutes before her scheduled shift was set to begin, and then return to her car to park it in the central parking area.  Cabantog Decl. at Exh. B (Limoli Dep. 58:13-17); Dent Decl. at Exh. A (DELTA_0000092-93).

49.    As Plaintiff returned to the curbside passenger drop-off area, she encountered CSA Kim Dunn, and Plaintiff said to Dunn "I will be back."  Cabantog Decl. at Exh. B (Limoli Dep. 30:8-14; 124:13-15) and Exh. I (DELTA_0000094); Rogers Decl. at Exh. L (DELTA_0000089).

50.    While still clocked in, Plaintiff drove her vehicle to central parking, and entered the garage at 11:58:32. Cabantog Decl. at Exh. B (Limoli Dep. 56:5-9; 58:18-20); Rogers Decl. at Exh. L (DELTA_0000090).

51.    Plaintiff testified to the following sequence of events: she parked her vehicle on the first floor of Central Parking; waited for the elevator; once on the elevator, she exited it on the second floor; and then she ran across the Sky Bridge to return to the terminal and into the employee locker room area. Cabantog Decl. at Exh. B (Limoli Dep. 59:4-14).

52.    Once in the locker room, Plaintiff placed her belongings in the Red Coat office, put on her uniform, geared up with her battery and radio, and then proceeded to the briefing room to attend the shift-briefing meeting that had commenced at 12:00 p.m.   Cabantog Decl. at Exh. B (Limoli Dep. 59:15-20).

53.    Shortly before the start of the 12:00 p.m. shift-meeting, Dunn, spoke with OSMs Beth Cerqueira and Mykal Dent and reported Plaintiff's behavior.  Cabantog Decl. at Exh. I (DELTA_0000094); Dent Decl. at Exh. A (DELTA_0000092-93); Rogers Decl. at Exh. O (DELTA_0000057-58).

54.     Plaintiff entered the shift-briefing meeting late, at approximately 12:04 p.m. Cabantog Decl. at Exh. B (Limoli Dep. 154:19-155:13) and Exh. J (DELTA_0000017-21); Dent Decl. at Exh. A (DELTA_0000092-93).

### III.     Delta and Mykal Dent investigate Plaintiff's misconduct.

55.     At the time of her employment termination, Plaintiff reported to OSM Gabriella Spagnolo, her direct supervisor.  Dent Decl. at ¶ 9.

56.     OSM Spagnolo did not work on March 30, 2017, as it was her regularly scheduled day off, so Mr. Dent and OSM Beth Cerqueira oversaw Ms. Spagnolo's direct reports, including Ms. Limoli. Dent Decl. at ¶ 9

57.     After speaking with Dunn and Cerqueira about Plaintiff leaving the terminal shortly before the start of her 12:00 p.m. shift, and having witnessed Plaintiff arrive late to the shift-briefing, Dent began to look into Plaintiff's conduct.  Dent Decl. at Exh. A (DELTA_0000092-93)

58.     At approximately 7:30 p.m. on March 30 when Plaintiff's shift was about to end, Dent approached her to ask about the events earlier in the day.  Cabantog Decl. at Exh. B (Limoli Dep. 45:1-15).

59.     Dent began the meeting by questioning Plaintiff about why she was "late today," to which Plaintiff replied that she was not late and had "punched in on time."  Cabantog Decl. at Exh. B (Limoli Dep. 45:12-15).

60.     Dent then asked her "why you were late to the briefing," to which Plaintiff admitted that she "parked out front, punched in and went and parked after that."  Cabantog Decl. at Exh. B (Limoli Dep. 45:23-46:5).

61.     Plaintiff testified that after she admitted to parking her car after clocking-in Dent's interest appeared "piqued," and then Dent immediately said "Oh, you can't do that" and "hang on,

that's another issue," or words to that effect.  Cabantog Decl. at Exh. B (Limoli Dep. 45:22-46:5; 54:9-19) and Exh. J (DELTA_0000019).

62.    After her admission, Dent "start[ed] pulling up all of [Plaintiff's] attendance [records]" and asking why she was late on particular dates.  Cabantog Decl. at Exh B (Limoli Dep. 45:22-46:9) and Exh. J (DELTA_0000019).

63.    Dent informed Plaintiff that there would be an investigation into her misconduct, provided Plaintiff with a pen and paper and asked her to write a statement, and left the room to give Plaintiff an opportunity to write her statement.  Dent Decl. at Exh. A (DELTA_0000092-93); Cabantog Decl. at Exh. B (Limoli Dep. 46:16-48:9).

64.    When Dent returned to the room, Plaintiff had not written her statement.  Dent Decl. at Exh. A (DELTA_0000092-93).

65.    Because Plaintiff appeared distraught, Dent asked Cerqueira to come down to the office and speak with Plaintiff.  Dent Decl. at Exh. A (DELTA_0000092-93)*;* Rogers Decl. at Exh. O (DELTA_0000057-58).

66.    During that exchange, Plaintiff admitted to Cerqueira that she "made a mistake." Rogers Decl. at Exh. O (DELTA_0000057-58).

67.    Cerqueira told Plaintiff her conduct on March 30 "reflected poor judgment and was not correct."  Rogers Decl. at Exh. O (DELTA_0000057-58).

68.    As to providing a written statement that evening, Plaintiff stated she was too upset to write at that time but that she would prepare a statement the following day on March 31. Cabantog Decl. at Exh. B (Limoli Dep. 47:3-6); Rogers Decl. at Exh. O (DELTA_0000057-58).

69.    The interview concluded and Plaintiff did not write a statement that night. Cabantog Decl. at Exh. B (Limoli Dep. 48:7-11); Rogers Decl. at Exh. O (DELTA_0000057-58).

70.     After meeting with Plaintiff on March 30th, Dent wrote his statement on the events and e-mailed it to his manager Michael Morrison; the statement summarized his initial investigation into Ms. Limoli's misconduct and his meeting with Plaintiff.  Dent Decl. at Exh. A (DELTA_0000092-93).

71.     On March 31, 2017, Dent forwarded his statement to Human Resources ("HR") Eve Rogers.  Rogers Decl. at Exh. J (DELTA_0000067-68).

72.     In Dent's e-mail to Rogers that forwarded his prior email to Morrison, he explained the facts as he knew them at the time: that Plaintiff had parked her car in front of the airport, clocked-in, left work to park her car in the airport parking garage, and then returned to work.  Rogers Decl. at Exh. J (DELTA_0000067-68).  Dent asked Rogers if Delta had "any comp[arators] for this type of situation with a recommendation for P[erformance] D[evelopment]."  Rogers Decl. at Exh. J (DELTA_0000067-68).

73.     Mr. Dent initially recommended Ms. Limoli not have her employment terminated but rather that she receive a minimum of a Corrective Action Notice ("CAN") and removal from the Red Coat Program which meant a demotion to CSA.  Rogers Decl. at Exh. J (DELTA_0000067-68).

74.     In response to Dent's communication, Rogers asked him if Plaintiff admitted to the conduct and clarified that Plaintiff's conduct is deemed "time theft and the typical recommendation is termination."  Rogers Decl. at ¶ 11, Exh. J (DELTA_0000067-68).

75.     Dent and the Company also followed-up on allegations by Plaintiff that other Delta employees engaged in similar time-fraud conduct such as parking a personal vehicle after clocking-in for work, to which Plaintiff said that these "instances were in the past and nothing recent" that she could identify.  Cabantog Decl. Exh. M (DELTA_00000060).

11

76.     In addition to following up with Plaintiff, Dent also obtained written statements from OSM Beth Cerqueira, CSA Kim Dunn, and Ms. Limoli on March 31, 2017.  Rogers Decl. at Exh. O  (DELTA_0000057-58)  and  Exh. L  (DELTA_0000089);  Cabantog Decl. at Ex. I (DELTA_0000094).

77.     Plaintiff e-mailed her statement to Elizabeth Cerqueira at about 10:53 p.m.[1]  Rogers Decl at Exh. L (DELTA_0000089); Cabantog Decl Exh. B (Limoli Dep. 48:7-17; 57:8-24).

78.     In her statement and at deposition, Plaintiff admitted that she "punched in at 11:56 [a.m.] then I ran back out to my vehicle."  Rogers Decl at Exh. L (DELTA_0000089); *see also* Cabantog Decl. Exh. B (Limoli Dep. 30:11-14)

79.     Plaintiff further wrote in her statement that she, "sincerely apologize[d]" and promised that she "will not do this again," referring to "pull[ing] up and punch[ing] in and get[ting] back in the car."  Rogers Decl at Exh. L (DELTA_0000089); Cabantog Decl. at Exh. B (Limoli Dep. 60:1-5).

80.     Delta suspended Plaintiff's employment on March 31, 2017 pending completion of its investigation into her time fraud.  Cabantog Decl. at Exh. J (DELTA_0000020).

81.     On April 1, 2017, Dent prepared a Recommendation for Termination ("RFT") for Plaintiff that he sent to Morrison and Rogers.  Rogers Decl. at Exh. K (DELTA_00001841-1842).

82.     On April 7, 2017, Rogers recommended Plaintiff's termination.  Rogers Decl. at Exh. I (DELTA_00001841).  As stated in her written recommendation, after a review of the facts, investigation, and statements provided, she concluded that Plaintiff parked at the curb, left her vehicle unattended, and "proceeded to clock in to avoid receiving a tardy.  She proceeded to move her car after she was clocked in."  Rogers Decl. at Exh. I (DELTA_00001841). Based on these

---

[1] Ms. Cerqueira completed and e-mailed her statement at 8:31 p.m. on March 31, more than two hours before Ms. Limoli submitted her statement to Ms. Cerqueira.

findings, Rogers concluded that Plaintiff be given the opportunity to resign but if she refused, Delta should terminate Plaintiff's employment.  Rogers Decl. at Exh. I (DELTA_00001841).

83.    At the time of HR's termination decision, Plaintiff had one active, unexpired written disciplinary action in her file: the March 2016 incident when she allowed a passenger to board a flight bound for the United Kingdom without a Visa.  As noted above, Delta received a fine of up to £2,000 (GBP) for Plaintiff's misconduct.  Rogers Decl. at Exh. I (DELTA_00001841); Cabantog Decl. at Exh. H (LIMOLI000010).

84.    On April 19, 2017, Delta terminated Plaintiff employment and OSM Gabriella Spagnolo informed Plaintiff of her termination by phone at approximately 6:45 P.M. on April 19th. Cabantog Decl. at Exh. K (DELTA_00000015-16). Consistent with Delta's practice with virtually all employees, Spagnolo informed Plaintiff that she had the option to resign in lieu of termination. Cabantog Decl. at Exh. K (DELTA_00000015-16).

85.    On April 20, 2017, Plaintiff refused to resign and instead opted for termination. Cabantog Decl. at Exh. J (DELTA_00000020).

**VII.    Delta's Equal Opportunity department denies Plaintiff's termination appeal.**

86.    Discharged employees can appeal their termination and include documents or other evidence in support of their appeal.  Rogers Decl. ¶ 18.

87.    On or about May 8, 2017, Plaintiff appealed her termination to Delta's Equal Opportunity department.   Cabantog Decl. at Exh. J (DELTA_00000017-22).

88.    In her appeal statement, Plaintiff again admitted to the wrongdoing and that she "used bad judgment and for that I am sorry."  Cabantog Decl. at Exh. J *(DELTA_00000017).*

13

89.    Plaintiff also admitted "full responsibility now as I did then for being late to the briefing because I was slow in putting my things away and having a conversation with another agent."  Cabantog Decl. at Exh. J *(DELTA_00000017)*.

90.    Plaintiff acknowledged that her conduct from March 30 warranted some form of discipline and wrote that she "would understand a reprimand such as a coaching or a letter in [her] file." Cabantog Decl. at Exh. J *(DELTA_00000017)*.

91.    On June 20, 2017, after reviewing Plaintiff appeal statement and the investigation into her misconduct, Brian San Souci wrote to Ms. Limoli informing her that her appeal had been denied.  Cabantog Decl. at Exh. L (DELTA_00000025).

Respectfully submitted,

DELTA AIR LINES, INC. AND
MYKAL DENT

By their attorneys,

/s/ Lisa Stephanian Burton
Lisa Stephanian Burton,  BBO# 562096
Lorenzo R. Cabantog,  BBO# 692298
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
One Boston Place, Floor 35, Suite 3500
Boston, MA 02108
Telephone:  617.994.5700
Facsimile:  617.994.5701

Dated:  June 20, 2019

14

## CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2019 this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those indicated as non-registered participants.

/s/ Lorenzo R. Cabantog _____
Lorenzo R. Cabantog

38989231.3

15