UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMY LIMOLI, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. |
| ) | 18-cv-10561-FDS |
| v. ) | |
| ) | |
| DELTA AIR LINES, INC., and ) | |
| MYKAL DENT, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM AND ORDER ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

**SAYLOR, J.**

This is an employment dispute arising out of an allegedly wrongful termination. Plaintiff Amy Limoli alleges that defendants Delta Air Lines, Inc., and Mykal Dent violated both the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2611 *et seq.*, and Massachusetts law by terminating her from her position as a Passenger Service Agent for Delta. Limoli specifically alleges that both defendants interfered with her FMLA rights and terminated her in retaliation for exercising those rights. In addition, she alleges that Dent intentionally interfered with her contract with Delta and that Delta wrongfully terminated her in violation of public policy.

Defendants have moved for summary judgment. For the following reasons, the motion will be granted.

**I.  Background**

   **A.  Factual Background**

The following facts are as set forth in the record and are undisputed except as noted.

1. **Limoli's Employment History at Delta**

On March 12, 2001, Amy Limoli was hired as a Customer Service Agent ("CSA") at Boston-Logan International Airport by Northwest Airlines. (*See* Cabantog Decl. (Dkt. No. 33), Ex. A). In 2008, Northwest merged with Delta Air Lines, Inc., and she became a Delta employee. (Rogers Decl. (Dkt. No. 35) ¶¶ 3, 11).

As part of the merger, Limoli's job title and responsibilities changed from CSA to Passenger Service Agent ("PSA"), which Delta employees also refer to as a "Red Coat." (*Id.*). As a Red Coat, Limoli was responsible for the same duties as a CSA, such as checking in passengers and handling their luggage, but she also supervised CSAs. (Dent Decl. (Dkt. No. 34) ¶ 3).

Between 2008 and 2017, Limoli requested FMLA leave on several occasions. (Compl. ¶¶ 15-17; Cabantog Decl., Ex. C ("Pl.'s Resps.") at 10). She did so for a variety of reasons. Most often, it was to permit treatment of her chronic sinusitis and to care for her stepdaughter, who suffers from a chronic kidney disease. (Compl. ¶¶ 9-17; Cabantog Decl., Ex. B ("Limoli Dep.") at 21:13-22:12; Pl.'s Resps. at 10-11). She also occasionally suffered from other illnesses and work-related injuries. (Pl.'s Resps. at 10-11).

On nearly every occasion that she requested FMLA leave, it was approved. (Limoli Dep. at 22:21-24). The only time Delta denied her request was when she had exhausted the maximum period to which she was entitled under the statute. (*Id.* at 23:1-16). In total, Delta approved more than 1,400 hours of FMLA leave for her between 2012 and 2017. (Cabantog Decl., Ex. D).

Between July 2013 and March 2016, Limoli was disciplined several times by Delta. Each time, she received a written disciplinary report. In July 2013, she was disciplined for failing to lock a storage room. (Cabantog Decl., Ex. E). In August 2014, she was disciplined because she had failed to show up for work on three separate days. (Cabantog Decl., Ex. F). She

then requested FMLA leave retroactively for those three days, which Delta approved. (Limoli Dep. at 66:13-67:5; Cabantog Decl., Ex. D at DELTA_00001830). In March 2016, she was disciplined for allowing a passenger to board an international flight without the appropriate visa, for which Delta was fined $2,000. (Cabantog Decl., Ex. H).[1]

Pursuant to Delta policy, each of those written disciplinary reports remained on Limoli's record for 18 months. (*See* Cabantog Decl., Exs. E, F, H). After 18 months, the record of each disciplinary incident would expire unless she received additional discipline within that period. (*Id.*). Her last written disciplinary report was on March 5, 2016, which meant that it would expire on September 5, 2017, absent additional discipline. (Cabantog Decl., Ex. H).

On September 19, 2016, Limoli returned to work after taking a period of FMLA leave. (*See* Pl.'s Resps. at 12). That FMLA leave was due to a work injury. (*See id.*). Upon her return, she had a meeting with her immediate supervisor, Gabriella Spagnolo. (*See* Pl.'s SMF (Dkt. No. 40), Ex. A). According to the complaint, the purpose of the meeting was to ensure that Limoli felt ready to return to work. (Compl. at ¶¶ 22-25).

### 2. Delta's Policies on Employee Time Records

As a Red Coat, Limoli was expected to show up on time for the start of her shifts. (Limoli Dep. at 26:1-6, 29:4-10). Red Coats who are late are marked "tardy" and may be disciplined. (*Id.*). Delta requires Red Coats to punch in at the start of a shift and then punch out at the end of it. (*Id.*; *see also* Dent Decl. ¶ 8). At Logan Airport, Delta employees punch in and out by swiping their employee badge at a computer station, which is located in the employee break room behind the Delta ticketing counter in Terminal A. (Dent Decl. ¶ 8).

---

[1] The written disciplinary report states that Delta was fined $2,000 for this incident, but an attached e-mail chain indicates the fine was 2,000 British pounds. (*See* Cabantog Decl., Ex. H). The difference does not matter for present purposes.

Delta expects its employees to maintain accurate timekeeping records. In its employee handbook, Delta prohibits "[f]alsifying records, including time cards, work records, or business expense reports." (Rogers Decl., Ex. B at DELTA_00002081). It considers misrepresenting time a terminable offense. (Rogers Decl. ¶¶ 9-10). If an employee punches in and then leaves to park her car, that counts as misrepresenting her timekeeping records. (*Id.*). Between 2014 and 2017, approximately 34 employees were terminated for timekeeping violations, including seven for punching in before parking. (*See id.*; Rogers Decl., Exs. C-H).

### 3. The Events of March 30, 2017

On March 30, 2017, Limoli had a headache due to a medical condition. (Limoli Dep. at 29:15-16). She was scheduled to work her usual shift, which ran from 12:00 noon to 8:30 p.m. (*See id.* at 26:1-3, 29:15-21). She planned to miss work due to her illness, but a friend convinced her to come in for her shift. (*Id.* at 29:15-21).

Although she usually took the bus to work, she decided to drive because she was running late. (*Id.* at 29:22-24). By the time she arrived at the airport, it was only a few minutes before noon. (*See id.* at 30:1-14). She parked her car in front of the terminal, went into the employee break room, and punched in at 11:56 a.m. (*Id.* at 30:8-24). On her way, she saw Kim Dunn, a Delta CSA whom she knew. (*Id.*). Limoli told Dunn that she would be back shortly. (Cabantog Decl., Ex. I; Rogers Decl., Ex. L). She then parked her car and ran to the terminal. (*Id.* at 58:21-59:14). She kept her parking ticket, which was time stamped 11:58:32. (Limoli Dep. at 58:18-20; Rogers Decl., Ex. L). She was late to a briefing at the start of her shift. (*Id.* at 155:11-13).

Mykal Dent is an Operations Service Manager ("OSM") at Delta. (Dent Decl. ¶ 2). That day, he was scheduled to work the same shift as Limoli—12:00 noon to 8:30 p.m. (*Id.* ¶ 9). Beth Cerqueira, another OSM, was also scheduled to work that shift. (*Id.*). Spagnolo, Limoli's direct supervisor, was off that day. (*Id.*). Shortly before the shift-briefing started, Dunn

4

informed Dent and Cerqueira that she had seen Limoli in the lobby and that Limoli had said "I will be back." (*Id.* at ¶ 10). Dent then saw Limoli arrive late to the shift-briefing at approximately 12:04 p.m. (*Id.*).

Near the end of Limoli's shift, Dent confronted her. (*Id.* at ¶ 10; Limoli Dep. at 45:1-15). He asked her why she had arrived late. (*Id.*). She said that she had punched in on time, and he asked why she was late to the shift-briefing. (Limoli Dep. at 45:9-15, 45:23-46:5). She admitted that she had parked out front, punched in, and then parked her car afterwards. (Dent Decl. ¶ 10; Limoli Dep. at 45:23-46:5). Dent told her that was not allowed, but she insisted that other Delta employees commonly did it. (*Id.*). He asked her to write a statement about what had happened, but she said she was too upset to do so and went home. (Dent Decl. ¶ 10; Limoli Dep. at 48:7-9).

### 4. **Limoli's Termination and Appeal**

Dent prepared a statement of the incident and e-mailed it to his manager, Michael Morrison. (Dent Decl. ¶ 10, Ex. A). The next day, March 31, 2017, he forwarded his statement to Eve Rogers, a Senior Human Resources Manager at Delta. (Dent Decl., Ex. A; Rogers Decl. ¶ 12). He suggested that Limoli receive a written disciplinary report and demotion to CSA, and asked whether that was an appropriate punishment. (Dent Decl. ¶ 12, Ex. A).

Rogers replied that Limoli's actions constituted "time theft and the recommendation[] is typically termination." (Rogers Decl., Ex. J). Based on that information, Dent then recommended to Rogers that Limoli be terminated. (Dent Decl. ¶ 12, Ex. C). His recommendation mentioned Limoli's written disciplinary report from March 2016. (Dent Decl., Ex. C). It also mentioned her September 2016 meeting with Spagnolo to discuss her return from FMLA leave. (*Id.*). Dent wrote that at that meeting, she had been "verbally coached about her unacceptable reliability," specifically her attendance. (*Id.*).

That same day, Limoli e-mailed a statement about the incident to Cerqueira. (Rogers

5

Decl., Ex. L). She admitted that she arrived late to the airport, punched in at 11:56, and then parked her car. (*Id.*). She also attached her parking ticket, which was time stamped at 11:58:00 a.m. (*Id.*).

On April 7, 2017, Rogers recommended to Josh Jessup, the General Manager of Human Resources, that Limoli should be asked to resign or, if she refused, terminated. (Rogers Decl., Ex. K). Rogers concluded—based on the statements by Dent, Dunn, and Limoli—that Limoli had deliberately falsified her timekeeping records by punching in before she parked her car, and it was Delta's policy to fire employees for such behavior. (Rogers Decl. ¶ 16). In her memorandum to Jessup, she shared that Dent, too, had recommended that Limoli be fired. (Rogers Decl., Ex. K). She also noted the March 2016 disciplinary action against Limoli, which remained on record at the time. (*Id.*). She did not, however, mention Limoli's September 2016 conversation with her supervisor about returning from FMLA leave. (*Id.*).

On April 19, 2017, Limoli was terminated from her job at Delta. (Cabantog Decl., Ex. K).

On May 8, 2017, Limoli appealed her termination to Delta's Equal Opportunity and Compliance Department. (Cabantog Decl., Ex. J). That appeal was denied. (Cabantog Decl., Ex. L).

> **B.** **Procedural Background**

Limoli filed this action on March 23, 2018. The complaint alleges that defendants Delta and Dent interfered with the exercise of her FMLA rights (Count 1) and retaliated against her for exercising those rights (Count 2); that defendant Dent is liable under Massachusetts law for intentionally interfering with a contract (Count 3); and that defendant Delta is liable under Massachusetts law for wrongfully terminating her in violation of public policy (Count 4).

Defendants have moved for summary judgment on all counts. Plaintiff has opposed this

6

motion, but she has only addressed defendants' contentions as to Count 2. Nevertheless, on an unopposed motion for summary judgment, the Court "is still bound to review the case on the merits." *Cordi-Allen v. Halloram*, 470 F.3d 25, 28 (1st Cir. 2008).

## II. Legal Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party. *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotations omitted). The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

## III. Analysis

### A. Whether the Court Should Deny the Motion Under Fed. R. Civ. P. 56(d)

As a preliminary matter, plaintiff asserts that the Court should deny the motion under Fed. R. Civ. P. 56(d). Rule 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition,

7

the court may," among other things, deny the motion. Fed. R. Civ. P. 56(d). Specifically, plaintiff asks the Court to deny this motion so that she can take additional depositions.

This is not plaintiff's first request for a discovery accommodation. At the scheduling conference, which was held on July 31, 2018, the Court ordered that fact discovery be completed within seven months—that is, by February 28, 2019.

On February 15, 2019, the parties jointly moved to extend discovery deadlines by three months, from February 28, 2019, to May 29, 2019. The Court granted that motion in part, and extended the close of discovery to May 15, 2019.

On May 23, 2019—after the close of discovery—plaintiff moved to extend the discovery period by another three months. Specifically, she asked for leave to take the depositions of Gabriella Spagnolo and defendant Mykal Dent. Plaintiff's counsel explained that he had been unable to take the depositions due to the departure of an attorney from his firm and a trial commitment in early 2019. He represented that the depositions were only necessary to use the testimony at trial, not to oppose defendants' motion for summary judgment. The Court denied that motion without prejudice to its renewal after its ruling on defendants' motion for summary judgment.

Plaintiff's counsel now contends that he does, in fact, need to take those two depositions in order to oppose summary judgment. However, he has not submitted an affidavit or declaration in support of that request. *See* Fed. R. Civ. P. 56(d). And he does not identify what facts he expects, or even hopes, to develop by deposition that are essential to defeating summary judgment. Under the circumstances, the Court will not deny the motion based on Rule 56(d), but will proceed to resolve the motion on the merits.

### B. Counts 1, 2: Family and Medical Leave Act Claims

The Family and Medical Leave Act both provides for certain rights to take leave and

protects employees who attempt to exercise those rights. *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 159-160 (1st Cir. 1998). Plaintiff asserts two separate violations of the FMLA on the part of both defendants: an "interference" claim and a "retaliation" claim. Both claims are asserted under 29 U.S.C. § 2615(a), which makes it unlawful for any employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." Although the language of the statute does not explicitly address retaliation, it is well-settled that employers are "prohibited from discriminating against employees . . . who have used FMLA leave." *Hodgens*, 144 F.3d at 160 n.4 (quoting 29 C.F.R. § 825.220(c)).

### 1. **Defendant Dent's Liability Under the FMLA**

Defendants first contend that Mykal Dent cannot be held individually liable under the FMLA because he does not qualify as an "employer" within the meaning of the statute.

The FMLA applies only to "employers," which includes, among other things, "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." 29 U.S.C. §§ 2611(4)(A)(ii)(I), 2615(a)(1)–(2). "Although the First Circuit has not directly addressed the issue of individual liability under the FMLA, 'the national trend is towards permitting individual liability and 'a majority of federal courts to address the issue of private supervisor liability have concluded that such liability exists.''" *Chacon v. Brigham and Women's Hosp.*, 99 F. Supp. 3d 207, 213 n.5 (D. Mass. 2015) (quoting *Reilly v. Cox Enters., Inc.*, 2014 WL 4473772 at *10 (D.R.I. Apr. 16, 2014)). "Courts in this circuit that have discussed the question 'most commonly have applied the parallel Fair Labor Standards Act ("FLSA") test' for individual liability because the FLSA, 29 U.S.C. § 203(d), and the FMLA similarly define 'employer.'" *Boadi v. Center for Human Dev., Inc.*, 239 F. Supp. 3d 333, 348 (D. Mass. 2017). That test asks "whether the supervisor exercised sufficient control over the employee." *Chacon*, 99 F. Supp. 3d at 213 n.5. To make that determination, the court must

examine whether an individual actor

> (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; [] (4) maintained employment records. . . [and (5)] had personal responsibility for making decisions that contributed to the alleged violation.

*Id.* (internal quotations omitted). The second and fifth factors carry the most weight. *Boadi*, 239 F. Supp. 3d at 348.

Here, the undisputed facts show that Dent did not have sufficient control over plaintiff to qualify as an employer under the FMLA. He did not have the authority to hire or fire employees. (Dent Decl. ¶ 6). He did not control the work schedules of CSAs or Red Coats. (Dent Decl. ¶ 7). He did not determine the rate or method of Delta employees' pay. (*Id.*). He did not maintain any employment records, other than those he created himself and sent to Human Resources. (*Id.*). He had no authority to approve or reject plaintiff's FMLA leave requests, which were handled by an outside vendor. (*Id.*). It is true that he arguably "had personal responsibility for making decisions that contributed to" plaintiff's termination, such as reporting her tardiness and recommending her termination. *See Brunelle v. Cytec Plastics, Inc.*, 225 F. Supp. 2d 67, 82 (D. Me. 2002). Nonetheless, in light of the other factors, he "simply was not a prominent enough player in [Delta's] operations to be considered an 'employer' for purposes of the FMLA." *See id.*

Accordingly, the Court will grant summary judgment in favor of Dent on Counts 1 and 2.

### 2. **The FMLA Interference Claim**

Defendants next contend that plaintiff cannot make out a *prima facie* case of FMLA interference because they did not deny her any FMLA benefits to which she was entitled.[2]

---

[2] Defendants also contend that, as in *Chacon*, the retaliation and interference claims are "redundant at best" and therefore the interference claim should be dismissed. *See* 99 F. Supp. 3d at 213. In *Chacon*, the plaintiff was

In order to make out a *prima facie* case for FMLA interference, plaintiff must show that (1) she was eligible for the FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to leave under the FMLA; (4) she gave her employer notice of her intention to take leave; and (5) her employer denied her FMLA benefits to which she was entitled. *Carrero–Ojeda v. Autoridad de Energía Eléctrica*, 755 F.3d 711, 722 n.8 (1st Cir. 2014).

Here, the undisputed facts establish that Delta did not deny plaintiff any FMLA benefits to which she was entitled. By plaintiff's own admission, every time that she requested FMLA leave and was entitled to take it, Delta approved her request. (Limoli Dep. at 22:21-24). The only times that Delta denied her requests to take FMLA leave were when she had exhausted the maximum period to which she was entitled under the statute. (*Id.* at 23:7-16). Overall, in the years before her termination, she took more than 1,400 hours of FMLA leave without any interference by Delta. (Cabantog Decl., Ex. D). Indeed, she herself appears to concede that there is no factual dispute on this claim. (Pl.'s Opp. at 3 n.2). Thus, because she received all the FMLA benefits to which she was entitled, her FMLA interference claim must fail. *See Chidebe v. MCI Telecomms. Corp.*, 19 F. Supp. 2d 444, 448 (D. Md. 1998).

Accordingly, the Court will grant summary judgment in favor of Delta on Count 1.

### 3. The FMLA Retaliation Claim

"In order to make out a *prima facie* case of retaliation, the employee 'must show that (1) [she] availed [herself] of a protected right under the FMLA; (2) [she] was adversely affected by an employment decision; (3) there is a causal connection between the employee's protected activity and the employer's adverse employment action.'" *Chase v. United States Postal Serv.*,

---

terminated after she requested FMLA leave. *Id.* at 212. Her retaliation and interference claims were redundant because they arose out of the same event: her firing, which prevented her from taking FMLA leave. *Id.* at 214-215. Here, plaintiff's termination did not interfere with her requests to take FMLA leave.

843 F.3d 553, 558 (1st Cir. 2016) (quoting *Hodgens*, 144 F.3d at 161).

Where, as here, there is no direct evidence of retaliation, the court must employ the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Colburn v. Parker Hannifin/Nichols Portland Div.*, 429 F.3d 325, 335 (1st Cir. 2005). Under that framework, the plaintiff must first establish a *prima facie* case of unlawful retaliation. *Id.* at 336. Once the plaintiff does so, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If the employer articulates such a reason, the burden shifts back to the employee to show that the employer's stated reason for the adverse action was in fact a pretext for retaliation. *Id.*

Here, there is no dispute as to the first two elements. Plaintiff availed herself of FMLA leave on multiple occasions, and her termination was obviously an adverse employment action. The issue is thus whether she can establish a causal connection between her various requests for FMLA leave and her termination. Defendants contend that even if she can, her conduct on March 30, 2017 was the legitimate, non-discriminatory reason for her termination, and she has not carried her burden to show that reason was pretextual.

    a.  <u>**Whether Plaintiff Can Show a Causal Connection**</u>

The causation standard applicable to FMLA retaliation cases is unresolved. *See Chase*, 843 F.3d at 559 n.2 (declining to choose the appropriate standard). One alternative is the negative-factor test, under which a plaintiff need only show that her decision to take FMLA leave was a "negative factor" in an adverse employment action. *See id.* (quoting 29 C.F.R. § 825.220(c)). The other is the traditional but-for cause test, which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* (quoting *University of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). There are colorable arguments in favor of either test. *Compare Gourdeau v. City of*

*Newton*, 238 F. Supp. 3d 179, 183-194 (D. Mass. 2017) (Young, J.) (adopting the but-for cause test) *with Chase v. United States Postal Serv.*, 149 F. Supp. 3d 195, 208-211 (D. Mass. 2016) (Woodlock, J.) (adopting the negative factor test).

The Court need not decide that question here. Because the FMLA retaliation claim fails for another reason, the Court will assume that the negative-factor test applies, which is more favorable to plaintiff. By that standard, plaintiff has shown that a reasonable factfinder could find a causal association here.

First, there was a close temporal proximity between plaintiff's final FMLA leave and her termination. She took FMLA leave on March 26 and 27, 2017—only four days before defendants started the process to terminate her. (*See* Cabantog, Ex. D at DELTA_00001820). "Certainly there are circumstances in which a '[v]ery close temporal proximity between protected activity and an adverse employment action can satisfy a plaintiff's burden of showing causal connection.'" *Germanowski v. Harris*, 854 F.3d 68, 74 (1st Cir. 2017) (quoting *Sánchez-Rodríguez v. AT&T Mobility P.R., Inc.*, 673 F.3d 1, 15 (1st Cir. 2012)).[3]

Second, plaintiff notes that Dent's termination recommendation mentioned the September 2016 meeting about her "attendance." Because he indirectly included her absences due to FMLA leave among the reasons to terminate her, arguably a factfinder could conclude that it was a negative factor in her termination.[4] Furthermore, although Limoli recalls her supervisor being supportive and accommodating at the meeting, Dent characterized it as a disciplinary incident in

---

[3] Temporal proximity, without more, may be insufficient to prove a causal relationship. *See Germanowski*, 854 F.3d at 74 ("the notion that temporal proximity is not always enough must also be correct"); *Wright v. CompUSA, Inc.*, 352 F.3d 472, 478 (1st Cir. 2003) ("[C]hronological proximity does not by itself establish causality, particularly if '[t]he larger picture undercuts any claim of causation.'").

[4] According to the complaint, that meeting was about Limoli's return from FMLA leave, not her attendance. (Compl. ¶¶ 21-25). There is no record evidence supporting that assertion.

13

his recommendation to Rogers.  (Dent Decl., Ex. C).

There is, to be sure, countervailing evidence.  Plaintiff had taken FMLA leave dozens of times over the course of nearly a decade, and she does not contend that she suffered retaliation on any of those occasions.  And Rogers's termination recommendation contained no reference to the September 2016 conversation and no mention of plaintiff's absences due to FMLA leave.  (Rogers Decl. ¶ 16, Ex. K).

Nonetheless, viewing the evidence in the light most favorable to plaintiff, the close proximity between her leave and her termination, and the circumstances of Dent's recommendation, are sufficient to support a finding of a causal relationship.  Plaintiff has thus established the existence of a *prima facie* case.

### b.  Whether Defendants Have Articulated a Legitimate, Non-Discriminatory Reason for Plaintiff's Termination

The burden then shifts to defendants to offer a legitimate, non-retaliatory reason for the termination.  *See Colburn*, 429 F.3d at 336.  Here, defendants contend that plaintiff was terminated because on March 30, 2017, she falsified her timekeeping records by punching in before she parked her car.  That reason unquestionably constitutes a legitimate, non-discriminatory reason for the termination.

### c.  Whether Defendants' Reason is a Pretext

The burden then shifts back to plaintiff to offer evidence that the stated reason was "in fact a pretext for retaliating against [her] for having taken FMLA leave." *Hodgens*, 144 F.3d at 160-61.  Plaintiff does not dispute that she violated company policy by punching in to work before parking her car on March 30, 2017.  Instead, she contends that it was unfair for Delta to fire her for a first-time offense.  It is undisputed, however, that Delta considers such behavior to be "a one-time terminable offense," and that it has fired other employees under similar

14

circumstances. (Rogers Decl. ¶¶ 9-10; *see, e.g.*, Rogers Decl., Exs. E, F). Plaintiff has offered no admissible evidence that she was treated differently from other employees because she had taken FMLA leave. While she initially alleged that Delta let other employees punch in before parking, she later conceded that she had only heard rumors and was speculating. (Limoli Dep. at 46:3-5, 104:16-19). It is also noteworthy that Dent did not recommend termination until after he learned that was the ordinary penalty for what she had done. (Rogers Decl., Ex. J). Presumably, if Dent had been using a pretext to fire her, he would have recommended termination when he reported her, rather than initially suggesting that she be demoted and receive a written disciplinary report. Nor has plaintiff produced any other evidence that the stated reason was not the actual reason for her termination.

In summary, plaintiff has failed to produce evidence sufficient to show that defendants' reason was a pretext. Accordingly, the Court will grant summary judgment in favor of Delta on Count 2.

### C. Count 3: Tortious Interference with Contract

"To establish a *prima facie* case for tortious interference with a contract, [plaintiff] must show that (1) a business relationship existed; (2) a defendant knowingly induced another defendant to break the contract; (3) the defendant's interference was intentional and improper; and (4) [she] was harmed as a result." *Prescott v. Higgins*, 538 F.3d 32, 43 (1st Cir. 2008) (citing *Shea v. Emmanuel Coll.*, 425 Mass. 761 (1997)). Additionally, in order to prevail on such a claim against a supervisor, an employee must demonstrate that the supervisor acted with actual malice. *Id.*; *see also Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 76 (1st Cir. 2006).

"Proof of actual malice requires more than a showing of mere hostility." *Zimmerman*, 262 F.3d at 76 (citing *King v. Driscoll*, 418 Mass. 576, 587 (1994)). If a supervisor simply dislikes an employee, or believes she was a poor employee, that is not enough. *King*, 418 Mass.

15

at 587. Holding a supervisor liable under those circumstances would violate the principle that a supervisor's "freedom of action directed toward corporate purposes should not be curtailed by fear of personal liability." *Gram v. Liberty Mut. Ins. Co.*, 384 Mass. 659, 664 (1981) (internal quotations omitted).

Here, the undisputed facts show that Dent acted for a corporate purpose and without actual malice. Dent was acting in Delta's corporate interest by reporting plaintiff for falsifying her time records, which was against company policy. (Rogers Decl. ¶¶ 9-10, Ex. B at DELTA_00002081). Plaintiff conceded that if she had witnessed the same scenario, she would have reported it, too. (Limoli Dep. at 103:18-23, 104:9-12). However, while she admits that he was justified in reporting her, she contends that he acted maliciously by going further up the chain of command than he had to. (*Id.* at 92:11-17). But even if his choice of whom to report to somehow went beyond Delta's corporate purposes, there is no evidence that his purported motives rose to the level of actual malice. Plaintiff contends in general terms that Dent wanted to "get a name out there for himself" so he could be assigned to Atlanta instead of Boston and that he "didn't know anything going on in [her] life." (*Id.* at 93:7-13).[5] But even if he was motivated by personal gain or hostility towards plaintiff, neither motive is sufficient to sustain a claim of tortious interference. *See King*, 418 Mass. at 587 (holding that "motives of personal and financial gain" were insufficient to show actual malice); *Zimmerman*, 262 F.3d at 76 (explaining that "actual malice requires more than a showing of mere hostility").

Accordingly, the Court will grant summary judgment in favor of Dent on Count 3.

---

[5] It is true that "the elements underlying a claim for unlawful retaliation may be used to show malice when a tortious interference claim is brought against a supervisor in a loss-of-employment case." *Zimmerman*, 262 F.3d at 77. Here, however, plaintiff has offered no evidence to show that Dent's motives were anything other than his interest in following corporate policy, his own career interests, or his dislike for her. (Limoli Dep. at 92:5-93:13).

### D. Count 4: Wrongful Termination Against Public Policy

In Massachusetts, "[t]he general rule is that an employment-at-will contract can be terminated at any time for any reason or for no reason at all." *Folmsbee v. Tech Tool Grinding & Supply, Inc.*, 417 Mass. 388, 394 (1994). For that reason, "an at-will employee has a cause of action for wrongful termination only if the termination violates a clearly established public policy." *King*, 418 Mass. at 582.

Here, plaintiff alleges that her termination "in response to her assertion of her statutorily protected rights constitutes a violation of a clearly established public policy." (Compl. ¶ 67). "A cause of action for wrongful termination in violation of public policy, however, is inapplicable where 'there is a comprehensive remedial statute, [and] the creation of a new common law action based on the public policy expressed in that statute would interfere with that remedial scheme.'" *Kelley v. Lawrence Pub. Sch.*, 2018 WL 6833508, at *3 (D. Mass. Dec. 27, 2018) (quoting *Perez v. Greater New Bedford Voc. Tech. Sch. Dist.*, 988 F. Supp. 2d 105, 113 (D. Mass. 2013)). At least two courts in this Circuit have previously held that the FMLA is one such remedial statute. *See id.*; *Minahan v. Town of E. Longmeadow*, 2015 WL 668451, at *1 (D. Mass. Feb. 17, 2015). So have other federal courts. *See Kelley*, 2018 WL 6833508, at *3 (collecting cases). Because plaintiff offers no reason why the Court should depart from that authority, the Court will grant summary judgment in favor of Delta on Count 4.

### IV. Conclusion

For the foregoing reasons, defendants' motion for summary judgment is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor, IV
F. Dennis Saylor, IV
Dated: November 22, 2019          United States District Judge